C. & E. TRUCKING CORPORATION *v.* STAHL ET AL.

[No. 19,629. Filed March 22, 1962. Rehearing denied April 30, 1962. Transfer denied February 24, 1964.]

*William E. Mills,* of South Bend and *Ross, McCord, Ice & Miller,* of Indianapolis, for appellant.

*Isadore D. Rosenfeld* and *Patrick Brennan,* both of South Bend, for appellees.

DISSENTING OPINION ON PETITION TO TRANSFER

ACHOR, J.—The facts in this case are stated in the opinion of the Appellate Court [*C. & E. Trucking Corporation* v. *Stahl* (1962), 181 N. E. 2d 21, 22-23, 24, 25], in part, as follows:

"This is an appeal from an award of compensation made by the Industrial Board of Indiana to

appellees as surviving dependants of one Donald R. Stahl, alleged to have died as the result of injuries arising out of and in the course of his employment with appellant corporation.

The facts may be summarized as follows: Appellant was a trucking company engaged in hauling freight and merchandise to and from different points in Indiana and adjoining states. Its general offices and headquarters were located in the city of South Bend. Donald R. Stahl and his brother, Richard Stahl, were employed by appellant to drive trucks owned by it. On Monday, February 23, 1959, they had been sent to Detroit, Michigan, in separate trucks. After unloading there, they received orders to go to St. Clair, Michigan, wait until morning and then pick up a load of salt at the Diamond Crystal Salt Company. Each brother was driving what is commonly termed a tractor and semitrailer.

St. Clair is approximately fifty miles north of Detroit. It is a small town, variously described at the hearing as a 'summer resort town,' with a population of around 1,500 to 2,000. The brothers left Detroit around 4:00 o'clock p. m., and arrived there within five to ten minutes of each other, and proceeded directly to the Salt Company premises. This was about 6:00 o'clock p. m. They put their trailers in loading docks and unhitched the tractors, arranging to return and load at 7:00 o'clock the next morning. Leaving Richard's tractor parked in the Salt Company lot, they climbed into the other and drove out of the premises.

Neither of them had anything to eat since breakfast and they wanted a hot meal. The reason they had not stopped along the way was due to the fact that the gates of the Salt Company were closed at 6:30 o'clock p. m. After leaving the Salt Company, Donald drove to a small hotel in St. Clair known as the Murphy Hotel. He and Richard registered there, obtaining a room for the night. After freshening up, they went to a tavern located on the first floor of the hotel, which had no kitchen facilities, but served beer and sandwiches. They stayed there the rest of the evening, playing pool on a miniature pool table and watching television.

They each had several bottles of beer. As Richard testified, they were just 'killing time.' Around midnight, they decided to go out and obtain a hot meal.

They used Donald's tractor for driving purposes. Several restaurants were located in St. Clair, but, according to Richard, they were either not open, did not serve warm meals, or were too fancy for them. They tried to find a particular one, south of St. Clair, on the way to Detroit, but, after making two attempts and not locating it, they finally drove north to Port Huron, a city of about 50,000 population, seven or eight miles north of St. Clair. They stopped at a place in the center of town, known as the Hambone Restaurant, where they obtained meals for themselves.

.  .  .

. . . Around 3:00 o'clock a. m., they left the restaurant and were returning to St. Clair, . . . when the accident occurred.

. . . [At 3:40 a. m. ] they came to a part of the highway which was covered with ice, and Donald, who was driving, hit an ice rut and lost control of the tractor, which, first, slid onto and straddled a snowbank and then ran across the road to smash into a tree [after it had skidded 375 feet]. The impact threw Donald halfway through the windshield with such force that it killed him immediately."

Other evidence, not included or not accurately recited in the Appellate Court opinion, is as follows:

At the time they arrived at the Murphy House (about 6:30 p. m.) they did not look for a restaurant where they could get a hot meal and they did not know whether any were open. They only knew that when they left the hotel at midnight "there wasn't."[1]

---

1. "Q.  Would you say there were no restaurants open at the time you arrived at the Murphy House in the City of St. Claire?

A.  I don't know.

When they left St. Clair at midnight, the roads were slick with ice.[2]

Under the facts above stated, two primary questions are presented for decision: (1) Whether the injury and death of Donald R. Stahl arose out of his employment, and (2) whether it occurred in the course of his employment. These are the conditions precedent to the recovery of compensation under Acts 1963, ch. 387, §1, p. 1025, being §40-1202, Burns' 1963 Supp.

The opinion of the Appellate Court cites and quotes from several cases which have undertaken to define what is meant by an accident arising *out of* and *in the course of* employment. The pertinent parts of the most recent of these is hereinafter quoted, as follows:

"In *Armstead, Widow, etc.* v. *Sommer et al., etc.* (1956), 126 Ind. App. 273, 276, 131 N. E. 2d 340, 342, the following statement is made:

'The words, "out of", point to the origin and cause of the accident or injury. The words, "in the course of", to the time, place and circumstances under which the accident or injury takes place. The character of the accident, as conveyed by the words, "out of", involves the idea that the accident is in some sense due to employment. It must, however, result from a risk *reasonably incident* to the employment." . . . [A]n injury

---

Q. Would you say there were or were not?
A. I didn't see any.
Q. Were there on that date, or do you know?
A. *When we left there, there wasn't.*
Q. When you arrived at the Murphy House?
A. We were not looking for a restaurant right at the time. We was worried about getting to bed."

2. "Q. When you left St. Clair, Michigan, I believe it was either near midnight or prior to midnight on the 23rd, is that correct?
A. Yes.
Q. How was the weather at that particular time?
A. The roads were slick, but it had stopped snowing at the time. The roads were icy."

arises "in the course of the employment," if it occurs while the employee is doing what a man so employed may reasonably do within the time in which he is employed and at a place where he may *reasonably be* during the time. *Bryant* [*Adm'x.*] v. *Fissell* (1913), 84 N. J. L. 72, 86 A. 458; *Union Sanitary Mfg. Co.* v. *Davis* (1917), 64 Ind. App. 227, 115 N. E. 676.' " [My emphasis.]

The Appellate Court opinion also quotes with approval from an earlier case, in which that court said:

" 'Such acts are necessary to the life, comfort, and convenience of the workman, while at work, though personal to himself, and not technically acts of service, are incidental to the service; . . .' *Holland, etc., Sugar Co.* v. *Shraluka* (1917), 64 Ind. App. 545, 549, 550, 116 N. E. 330, 331."

In substance, the above cases hold that an accident occurs *in the course of employment* when it takes place within the period of the employment at a place where the employee may reasonably be, and while he is fulfilling the duties of his employment or while he is engaged in doing something reasonably incidental to such employment. And an accident may be said to *arise out of* the employment where there is a causal connection between the accident and a performance of some service which is directly related or is reasonably incidental to the employment. And if the injury occurs while the employee is performing an act which is personal to himself and not technically an act of service for his employer, it must be incidental to such employment and to warrant compensation, it must be reasonably necessary to the life, comfort and convenience of the workman, *while at work.*

It is appellant's contention that the two brothers detached themselves from their employment when they

left St. Clair at midnight and drove their employer's truck-cab to a restaurant in Port Huron to get a "hot meal." That this activity, by reason of which they were on the highway at 3:40 a. m., was solely for their own pleasure and was in nowise reasonably necessary to their "life, comfort and convenience . . . while at work." In this, I concur. By the standard above established in the Appellate Court opinion itself, the accident and injury did not arise out of or in the course of employment.

Furthermore, in my opinion the following statements, upon which the Appellate Court decision is made to rest, is based upon a distortion of a prior decision of that court and is bad law. The statements which I find objectionable are as follows:

> "Where a truck driver's employment requires him to be away from home, it has been held that he is within the course of his employment from the time he embarks until he returns to his home or place of business."

> " . . . In situations such as this [where the employee is required to stay overnight], 'killing time' is as much a part of the job as loading, unloading and driving trucks. Irregularities, variabilities and caprice in the methods by which it is done are immaterial." [Page 24.]

As authority for these statements, the Appellate Court quotes from the case of *Lasear, Inc.* v. *Anderson* (1934), 99 Ind. App. 428, 436, 192 N. E. 762, 765, in which the court stated:

> " 'His *duty and responsibility* to his employer were uninterrupted and continuous from the moment he left the city . . . with the truck and merchandise until he had delivered the load at its destination and returned to the city . . . " [My emphasis.] [Page 25, 181 N. E. 2d.]

That case does *not* state that the driver of a truck remains in the *employment* of the owner of the truck "from the time he embarks until he returns to his home or place of business." The case merely holds that the driver of the truck had an uninterrupted "duty and responsibility" for the care, custody and safe keeping of his employer's truck and merchandise until it was returned. In that case compensation was properly awarded because, although the employee died by asphyxiation while asleep, death occurred in the performance of a "duty and responsibility." In support of the decision in that case, the court stated [page 437]:

" . . . When he and the other drivers stopped for the night, they did not abandon the trucks but parked them side by side within a distance not to exceed seventy-five feet from the cabin which they were to occupy, so that in case the trucks were molested, they would be more easily awakened should they be asleep, and could more readily reach and protect the property. [Thus] [t]he nexus between Anderson and his employers was never terminated. . . . "

The Lasear case, *supra,* is merely authority for the proposition that where a truck driver's employment requires him to be away from home, he is within the course of his employment from the time he embarks until he returns to his home or place of business, so long as he is performing a service consistent with his "duty and responsibility to his employer," or is engaging in acts which are reasonably necessary to the life, comfort and convenience to the workman, while at work for his employer.

It is significant, if not ironical, that the court in the Lasear case, *supra,* also stated [page 437]:

" . . . Of course it was necessary and it must have been contemplated, that he should have sleep, . . . "

Whereas, the Appellate Court in the present case, on the same authority, concluded that since the employees were required to be away from home over night, they were free to "kill time" as they saw fit while not actually at work; that the employer-employee relationship continued unbroken and that injury arose out of such employment even though the injury occurred while they were conducting themselves in total disregard and in derogation of their "duty and responsibility" to their employer to obtain a reasonable amount of sleep and as to the safe keeping of their employer's equipment. Specifically, the court stated [page 24]:

" . . . Irregularities, variabilities and caprice in the methods by which it is done are immaterial."

This is not my understanding of the law.

NOTE.—Reported in 196 N. E. 2d 271.